**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

ALBERTSONS COMPANIES, INC., ASSOCIATED GROCERS OF THE SOUTH, INC., ASSOCIATED GROCERS OF FLORIDA, INC., H-E-B, LP, HY-VEE, INC., THE KROGER CO., MEIJER, INC., MEIJER DISTRIBUTION, INC., PUBLIX SUPER MARKETS, INC., RALEY'S, RALEY'S ARIZONA, LLC, SUPERVALU, INC., UNIFIED GROCERS, INC., TONY'S FINE FOODS, SAVE MART SUPERMARKETS LLC, UNITED NATURAL FOODS, INC., US FOODS, INC. AND AHOLD DELHAIZE USA, INC.,

*Plaintiffs,*

v.

ASR GROUP INTERNATIONAL, INC., AMERICAN SUGAR REFINING, INC., DOMINO FOODS, INC., IMPERIAL SUGAR CO. N/K/A UNITED STATES SUGAR SAVANNAH REFINERY, LLC; UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE F/K/A UNITED SUGARS CORPORATION, COMMODITY INFORMATION, INC., AND RICHARD WISTISEN

*Defendants.*

Case No. ___________________

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Albertsons Companies, Inc. ("Albertsons"), Associated Grocers of the South, Inc. ("AGS"), Associated Grocers of Florida, Inc. ("AGFL"), H-E-B, LP ("HEB"), Hy-Vee, Inc. ("Hy-Vee"), The Kroger Co. ("Kroger"), Meijer, Inc. and Meijer Distribution, Inc. (individually and collectively, "Meijer"), Publix Super Markets, Inc. ("Publix"), Raley's ("Raley's"), Raley's

Arizona, LLC ("Raley's AZ"), SUPERVALU, Inc. ("SUPERVALU"), Unified Grocers, Inc. ("Unified"), Tony's Fine Foods ("Tony's), Save Mart Supermarkets LLC ("Save Mart"), United Natural Foods, Inc. ("UNFI"), US Foods, Inc. ("US Foods") and Ahold Delhaize USA, Inc. ("Ahold") (collectively, "Plaintiffs") are retail supermarket chains, wholesale grocers or food service operators who were victimized by the conspiracy and unlawful actions alleged in this Complaint. Plaintiffs, upon personal knowledge as to the facts pertaining to themselves, and upon information and belief based on investigation of counsel as to all other matters, bring this action against ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "Domino Sugar"), Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial"),[1] United Sugar Producers & Refiners Cooperative f/k/a United Sugars Corporation ("United" and together with Imperial and Domino Sugar, the "Producing Defendants"), Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," and together with Commodity and the Producing Defendants, "Defendants") for violations of the Sherman Antitrust Act and seek treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demand a trial by jury on all matters so triable.

## I. NATURE OF THE ACTION

1. This action challenges an unlawful agreement by Defendants to raise, fix maintain, and/or stabilize the prices for Refined Sugar (defined below) in the United States.

2. The Producing Defendants are among the largest producers and sellers of Refined Sugar – sugar that is extracted from sugar cane or sugar beets and processed to yield granulated

---

[1] Plaintiffs recognize that the District Court dismissed Defendant Imperial. Plaintiffs identify Imperial in this complaint for the purpose of preserving appellate rights to challenge this dismissal.

white sugar, brown sugar, powdered sugar and liquid sugar – in the country and directly compete against each other.

3. Plaintiffs are retail supermarket chains, wholesale grocers or food service operators who are victims of the alleged conspiracy because they directly purchased Refined Sugar, including Granulated Sugar (defined below), from one or more of the Producing Defendants and/or their co-conspirators at supra-competitive prices.

4. Defendants' price fixing conspiracy was multi-faceted and facilitated through the direct and indirect exchanges of, among other information, detailed, contemporaneous and forward looking, competitively sensitive, non-public information regarding, among other things, Producing Defendants' Refined Sugar prices, amounts sold, production levels and production intentions ("Confidential Competitive Information").

5. Although the Producing Defendants exchanged information directly with each other and indirectly through other sources other than the Commodity Defendants, the Commodity Defendants were central to the scheme, routinely orchestrating and facilitating the exchange of Confidential Competitive Information between the Producing Defendants, who, in turn, used their competitors' Confidential Competitive Information to fix and maintain Refined Sugar prices at artificially elevated prices.

6. The Confidential Competitive Information that the Commodity Defendants gathered directly from each of the Producing Defendants was made available only to subscribers and was not publicly available. As a result, Producing Defendants had access to each other's Confidential Competitive Information but their customers, including Plaintiffs and other victims of the conspiracy, did not.

7. Through the Commodity Defendants, the Producing Defendants engaged in a "give to get" arrangement to effectuate, monitor, and enforce their conspiracy. They would "give" their Confidential Competitive Information to the Commodity Defendants on the expectation and understanding that they would, in return, "get" their competitors' Confidential Competitive Information from the Commodity Defendants.

8. Each time that the Producing Defendants would give and get Confidential Competitive Information, they would be reassured that each of co-conspirators were adhering to the conspiracy.

9. Several other factors made the Refined Sugar market highly susceptible to the conspiracy. These plus factors include, without limitation, the vertically integrated and highly concentrated nature of the industry, the significant costs and other barriers for new entrants to enter the market, numerous opportunities for Defendants to collude at trade association and other events, and the inelastic demand for Refined Sugar among purchasers like Plaintiffs.

10. Defendants' unlawful agreement and actions pursuant thereto began at a time uncertain, but at least by 2019, and, as a result, Refined Sugar prices have increased steadily and have remained elevated above historic levels ever since (the "Relevant Time Period").




U.S. Bureau of Labor Statistics, *Producer Price Index by Commodity: Processed Foods and Feeds: Refined Sugar Products and Byproducts [WPU0253]*, FRED, Federal Reserve Bank of St. Louis (July 29, 2026), https://fred.stlouisfed.org/series/WPU0253.

11. Supply, demand, and other legitimate explanations for this drastic upward departure from historic Refined Sugar prices do not exist.

12. This action – which alleges a violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. § 1 and 3 – seeks overcharge damages and related relief to redress Defendants' unlawful conduct, which prevented free and fair competition and caused Plaintiffs to pay substantial overcharges on Refined Sugar, including Granulated Sugar, during the Relevant Period.

## II. PARTIES

### A. Plaintiffs

13. Plaintiff Albertsons Companies, Inc. ("Albertsons") is a Delaware limited liability company with its principal place of business in Boise, Idaho. Albertsons owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Albertsons directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

14. Plaintiff Associated Grocers of the South, Inc. ("AGS") is an Alabama corporation with its principal place of business in Birmingham, Alabama. AGS is a grocery cooperative that sells Refined Sugar to its members. During the Relevant Time Period, AGS directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

15. Plaintiff H-E-B, LP ("HEB") is a Texas limited partnership with its principal place of business in San Antonio, Texas. HEB owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, HEB directly purchased Refined Sugar in the United States from

one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

16. Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Hy-Vee owns and operates retail stores that sell Refined Sugar. Hy-Vee brings this action on its own behalf, on behalf of certain subsidiaries, and on behalf of its assignor (Topco Associates, LLC), each of which directly purchased Refined Sugar from one or more Producing Defendants and their co-conspirators during the conspiracy alleged in this Complaint. The reference in this Complaint to "Hy-Vee" includes Hy-Vee's subsidiaries and assignor. During the Relevant Time Period, Hy-Vee directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

17. Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Kroger owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Kroger directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

18. Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Meijer") are Michigan corporations with their principal place of business in Grand Rapids, Michigan. Meijer owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Meijer directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

19. Plaintiff Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida. Publix owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Publix directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

20. Plaintiff Raley's ("Raley's) is a California corporation with its principal place of business in West Sacramento, California. Raley's owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Raley's directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

21. Plaintiff Raley's Arizona LLC ("Raley's AZ") is an Arizona limited liability company with its principal place of business in Chandler, Arizona. Raley's AZ owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Raley's AZ directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

22. Plaintiff SUPERVALU, Inc. ("SUPERVALU") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. SUPERVALU is a wholesale distribution company and retail store operator that sells Refined Sugar. During the Relevant Time Period, SUPERVALU directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

23. Plaintiff Save Mart Supermarkets LLC ("Save Mart") is a California limited liability corporation with its principal place of business in Modesto, California. Save Mart owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Save Mart directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

24. Plaintiff United Natural Foods, Inc. is a Delaware corporation with its principal place of business in Providence, Rhode Island. United Natural Foods, Inc. is a leading distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in the United States. Plaintiffs SUPERVALU and Associated Grocers of Florida, Inc. ("AGFL") are wholly owned subsidiaries of United Natural Foods, Inc. Plaintiff Unified Grocers, Inc. ("Unified") is a wholly owned subsidiary of Plaintiff SUPERVALU. Plaintiff Tony's Fine Foods ("Tony's) is a wholly owned subsidiary of UNFI. Together, United Natural Foods, Inc., SUPERVALU, AGFL, Unified, and Tony's. are referred to as "UNFI." During the Relevant Time Period, UNFI directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

25. Plaintiff US Foods, Inc. is a Delaware corporation ("US Foods") with its principal place of business in Rosemont, Illinois. US Foods is a food distributor that sells Refined Sugar. During the Relevant Time Period, US Foods directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

26. Plaintiff Ahold Delhaize USA, Inc. ("Ahold") is a Delaware corporation with a principal place of business in Quincy, Massachusetts. Ahold owns and operates retail stores that sell Refined Sugar. During the Relevant Time Period, Ahold directly purchased Refined Sugar in the United States from one or more Producing Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

27. Plaintiffs are each a "person" with standing to sue Defendants for damages and other relief under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

**B. Defendants**

(i) Domino Sugar

28. Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. ASR Group is global producer and seller of Refined Sugar based in West Palm Beach, Florida. It is a subsidiary of the Sugar Cane Growers Cooperative of Florida and Florida Crystals Corporation. It operates four cane refineries in Crockett, California; Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York. ASR Group asserts that it is "the world's largest refiner and marketer of cane sugar[;] we sell our branded products and service our customers in every key channel, including industrial, grocery and e-commerce, food service and specialty." ASR has approximately 177 products available in grocery stores across the nation, under the Domino, C&H, Florida Crystals, and Redpath brand names.

29. Defendant ASR is a privately held Florida corporation and global producer and seller of Refined Sugar based in West Palm Beach, Florida.

30. Defendant Domino is a subsidiary of ASR Group. It markets and sells ASR Group and ASR's Refined Sugar and has its principal place of business in West Palm Beach, Florida. Domino Sugar markets its members Refined Sugar under the Domino® brand name.

(ii) United

31. Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming.

32. United approaches the market as one entity, marketing and selling all the Granulated Sugar produced by its member owners. United sets prices for its member owners' Refined Sugar in the market.

(iii) Imperial

33. Defendant Imperial is a Delaware corporation with its principal place of business in Georgia. United States Sugar Savannah Refinery, LLC, a wholly-owned subsidiary of United States Sugar, purchased Imperial in November 2022. Prior to the acquisition and thereafter, Imperial processed and sold Refined Sugar from a cane sugar refinery in Savannah Georgia and liquefication facility in Ludlow Kentucky.

(iv) Commodity and Wistisen

34. Defendant Commodity is a Delaware corporation based in Orem, Utah. Throughout the Relevant Time Period, the Producing Defendants utilized Commodity to implement and police the alleged conspiracy and facilitate much of the exchange of Confidential Competitive Information in furtherance of the alleged conspiracy.

35. Defendant Wistisen is the principal, President, and Senior Analyst of Commodity who, as part of Defendants' unlawful agreement, collected and shared Confidential Competitive Information between the Producing Defendants.

(v) Co-Conspirators

36. Various persons, firms, and companies not named as defendants in this Complaint have, on information and belief, participated as co-conspirators with Defendants, and have performed acts and made statements in furtherance of, the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as defendants in this Complaint.

37. Defendants' co-conspirators include, without limitation, Michigan Sugar Company and the cooperative members of the Producing Defendants, including United States Sugar Corporation, American Crystal Sugar Company, Minn-Dak Farmers Cooperative and Wyoming Sugar Company.

38. Whenever reference is made to any act of an entity or company, the allegation means that the entity or company engaged in the act by or through its officers, directors, managers, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's or corporation's business or affairs.

39. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## III. JURISDICTION AND VENUE

40. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

41. Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 139(b) because during the Relevant Time Period, Defendants resided, transacted business, were found, or had agents, in this District, and because a substantial part of the events and omissions affecting interstate trade and commerce and giving rise to Plaintiffs' claims of wrongful conduct happened in this District.

42. This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy through the U.S., including in this District. The alleged conspiracy has been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including this District.

## IV. SUGAR TYPES AND CHARACTERISTICS

43. "Refined Sugar" as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield granulated sugar, brown sugar, powdered sugar, and liquid sugar.

44. "Granulated Sugar" as that term is used herein is also known as white or table sugar and is a type of Refined Sugar that is ground and granulated to a certain size of particles and is processed, containing no coloring and no additives. It is the most well-known form of sugar in the United States, and it is commonly used in baking and cooking and in food products.

45. In addition to Granulated Sugar, Refined Sugar is also sold in other forms after it has been modified, including liquid sugar, brown sugar, and powdered sugar.

46. Granulated Sugar is the core input used to create the other Refined Sugars: liquid sugar is usually made by dissolving Granulated Sugar in water; brown sugar is made by adding

molasses to Granulated Sugar; and powdered sugar is made by pulverizing Granulated Sugar and adding corn starch.

47. As the core input, refiners, such as Producing Defendants, routinely convert Granulated Sugar into powdered sugar, brown sugar, or liquid sugar using these additional processing steps, often performed at the same refining facilities.

48. Refined Sugar, including Granulated Sugar, is a commodity product, meaning that the Refined Sugar sold by one Producing Defendant is highly interchangeable – even indistinguishable from – the Refined Sugar sold by another Producing Defendant. As such, competition for Refined Sugar sales is based principally on price, as opposed to quality or some other product characteristic and thus is subject to cartel behavior.

## V. <u>DEFENDANTS' MARKET POWER IN RELEVANT MARKETS</u>

49. Defendants' agreement to artificially raise, fix, maintain, or stabilize prices of domestic Refined Sugar sold in the United States constitutes a *per se* violation of Section 1 of the Sherman Act. As such, Plaintiffs are not required to define a relevant market or plead that Producing Defendants possessed market power within such a market. However, to the extent one or more of Plaintiffs' claims are not analyzed under the *per se* standard, Plaintiffs allege the following facts to show that the relevant market is Refined Sugar sold in the United States and that Producing Defendants' possessed market power in said market.

50. Demand for one form of Refined Sugar is closely linked to the supply and provision of the others, such that market conditions affecting one form of Refined Sugar materially affect others. For example, if the price of Granulated Sugar rises, the prices of other Refined Sugars, for which Granulated Sugar is the key input, will rise as well.

51. While non-sugar sweeteners exist, they are not reasonable alternatives to Refined Sugar. For example, a grocery store is unlikely to replace Refined Sugar with other sweeteners, even if Refined Sugar prices spike, because consumers prefer the taste of sugar, particularly for items such as baked goods and coffee.[2]

52. Refined Sugar is marketed, transported, and sold nationwide. Although Refined Sugar can and is transported long distances domestically, regulatory, logistical and other challenges and differences prevent purchasers, such as Plaintiffs, from timely or economically substituting foreign-sourced Refined Sugar in the normal course of their business.

53. During all or part of the Relevant Time Period, Producing Defendants together with their co-conspirators controlled at least 70% of the market. According to an analysis by a United Sugars Corporation presentation, the Sugar "Supply: Industry Structure" as of February 2020 reflected the following market shares:

| Company | Percentage of Supply Industry Structure |
|---|---|
| United Sugars | ~ 29% |
| Domino Sugar | ~ 29% |
| National Sugar Marketing (NSM) | ~14% |
| Cargill | ~ 8% |
| Imperial | ~ 6% |
| Michigan | ~ 6% |
| Western Sugar | ~2% |
| Imports | ~ 7% |

---

[2] In the alternative to Plaintiffs' Refined Sugar product market definition, Plaintiffs allege that the relevant product market is Granulated Sugar. As with the broader category of Refined Sugar, Granulated Sugar has unique physical characteristics and properties that customers require for particular purposes.

## VI. DEFENDANTS' UNLAWFUL CONSPIRACY AND ITS IMPACT

### A. Defendants' Exchanges of Confidential Competitive Information

54. Refined Sugar customers, including Plaintiffs, purchase Refined Sugar from Defendants in multiple ways, including for future delivery and, on occasion, for more immediate delivery. The contracts for immediate delivery are called "spot contracts." Prices from spot contracts can influence future contract pricing, and spot contract prices can also be turned into future contract prices.

55. Refined Sugar prices typically reflect prices as a function of cents per pound of product delivered (*i.e.*, "c per lb," fractional "$ per lb," or "c") or dollars per hundredweight of product delivered ("$ per cwt" or "$").

56. Supply influences Refined Sugar prices. A sold position, coverage percentage, or booking percentage (collectively "sold position") is the amount of supply of Refined Sugar that has been sold or otherwise accounted for during the current calendar or fiscal year or a future calendar or fiscal year. As a seller's sold position increases, that seller will generally have greater incentive and ability to raise its Refined Sugar prices. Knowing a Producing Defendant's Refined Sugar sold position allows other Producing Defendants to charge a premium for their Refined Sugar.

57. In a market free of collusion, Producing Defendants would closely guard their pricing, price intentions, sold positions and other Confidential Competitive Information and compete aggressively – especially on price for a commodity product such as Refined Sugar – to win more and better customers.

58. The Producing Defendants did not do that. Instead of competing against each other, they chose to collude: to raise, fix, maintain, or stabilize Refined Sugar prices together over the Relevant Time Period.

59. Producer Defendants knowingly and regularly coordinated their prices in part by sharing their Confidential Competitive Information with each other.

60. While not the only means by which the Producing Defendants exchanged Confidential Competitive Information, the Commodity Defendants were at the center of Defendants' unlawful scheme. Each of the Producing Defendants regularly shared Confidential Competitive Information about their current and future pricing and sold positions with Commodity and Wistisen, and Commodity and Wistisen, in turn, contemporaneously shared that same Competitive Information with other Producing Defendants in furtherance of the alleged conspiracy.

61. This "give to get" arrangement allowed Defendants to effectuate and monitor adherence to their scheme in real time.

62. Through emails, phone calls or and other direct lines of communication, each of Producing Defendants would "give" their Confidential Competitive Information to Wistisen, knowing full well that Wistisen would relay such information to the competition, and that they would "get" corresponding Confidential Competitive Information from their competitors in return.

63. In doing so, Producing Defendants were acting against their self-interest and against company policies that prohibit the sharing of such information.

64. Defendants' behavior was first disclosed, in part, in November 2022 through the unsealing of information in a United States Department of Justice lawsuit to challenge a merger involving Imperial and an affiliate of United ("Merger Action").

65. In that Merger Action, United's CEO, Matthew Wineinger testified that he expected his employees to treat United's sold position as confidential and keep that information close to the vest. Similarly, Domino Sugar's Senior Vice President of Sales, Marketing, and Product

Development, Robert Sproull, testified that Domino Sugar has a written code of conduct with an ethics policy that prevents any Domino Sugar employee from directly talking about Domino's pricing with a representative of one of Domino's competitors. Yet, Producing Defendants freely shared their Confidential Competitive Information with Wistisen.

66. Wistisen, in turn, shared information directly with each Producing Defendants via email and telephone. Wistisen also compiled all of the Confidential Competitive Information he had collected, including current and future pricing, in a monthly report which he distributed among the Producing Defendants and their co-conspirators. Key aspects of the Confidential Competitive Information, including current and future pricing, was not anonymized, averaged, or aggregated.

67. Each time that the Producing Defendants would give and get Confidential Competitive Information, they would be reassured that the conspiracy was working as intended.

68. Commodity operated without a public presence, despite purporting to analyze the sugar industry. Indeed, unlike most other market reporting services, Commodity does not: 1) maintain a website; 2) advertise its services; 3) publicly publish its reports; 4) offer to sell any reports to the public, including Plaintiffs; or 5) rely principally on publicly available information, anonymized voluntary surveys, or anonymized periodic polling.

69. Instead, Commodity obtains information directly from Refined Sugar growers and producers in exchange for information about their competitors.

70. According to Commodity's distribution policy: "Commodity Information Inc. reports are exclusively for paying clients" and recipients are to "… use our reports with integrity by not forwarding them to anyone outside of your company."

71. In short, Commodity worked in the shadows.

72. Commodity operated secretly, and exclusively or primarily for the benefit of Producing Defendants and their co-conspirators by design, that is, to differentiate itself from other public market reporting services and to facilitate Defendants' unlawful scheme.

73. In effect, Commodity served as the proverbial "smoke-filled room" for the Producer Defendants, allowing the Producing Defendants to exchange their current and future pricing plans, sold positions, and other Confidential Competitive Information with each other in furtherance of raising, fixing, stabilizing or fixing the prices of Refined Sugar above competitive levels.

74. While Commodity played a key role in the conspiracy, the Producing Defendants also acted independent of Commodity to further the scheme. For example, Defendant Domino Sugar's Vice President, Alan Henderson, obtained competitor pricing at a major trade event in 2020, and United CEO Michael Wineinger sent messages and signals to competitors, including sending a message in one instance in which he said United "pull[ed] some older offers while sending a message to NSM and other competitors that were not interested in allowing the market to slip lower." NSM refers to sugar refiner National Sugar Marketing Cooperative.

75. Upon information and belief, and without the benefit of discovery, Plaintiffs have access to only a fraction of all of Defendants' conspiratorial communications and actions. However, the unsealed communications alone provide direct evidence of Defendants' broad, long-running scheme to coordinate and increase the prices of the Refined Sugar they sold in the marketplace, including to Plaintiffs. Discovery will uncover the full scope of Defendants' conspiracy.

76. Representative examples of Defendants' unlawful communications – organized by date – are described below.

77. On September 16, 2019, Wistisen wrote an email to Domino Sugar's Henderson telling him that it "[s]ounds like the beet crop struggles have lifted beet prices 50 cents or more, but that cane prices are mostly steady (maybe a little higher on West coast)," and Wistisen asked Henderson "where you would put refined prices and coverage?" Henderson quickly responded with Domino Sugar's confidential pricing information and intentions: "Pricing for FY20": "Northeast - $38.50 bulk basis;" "Gulf - $36.50 bulk basis;" and "West - $39.00 bulk basis;" also providing coverage for cane refiners: "70 to 75% covered for FY20. The open business that does remain will be at higher prices."

78. Later that night, in another email response, Wistisen thanked Henderson. Wistisen reported that "[t]he price updates I did receive today didn't have nearly the level of cane price increases you reported ... but I bet they're headed that way (except maybe the gulf number, 36.50 seems pretty high)[.]"

79. Wistisen also told Henderson that there were "[v]ery few crop updates or pricing updates today ... I'll send them over as they come in over the next day or two." Wistisen described "harvest issues would be at Minn-Dak and So-Minn" and also wrote that "Crystal is also too wet on the majority of beets, but northern beets, which have been dry, are doing better on moisture. They haven't changed their projected tpa or sugar forecasts." Wistisen further reported that there was "improved weather for Western, but the damage, for the most part has been done," that "Amalgamated [was] still looking at a very strong crop," and that "Michigan crop could exceed last season on high sugars, spurred by drought."

80. On January 8, 2020, Henderson told Domino Sugar's Rob Sproull, the company's Senior Vice President of Sales, Marketing, and Product Development, that an industrial customer was looking for a quote and that the request "might be a good opportunity to test the market[.]"

81. Sproull replied by email the same day that he believed it was "really important to signal to the market that there's still going to be tightness," because "[b]eets come in with no supply" and "[s]ome of their supply is already committed as they said they'd replace the 18% from United." Sproull said, "We need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

82. On March 3, 2020, Domino Sugar's Henderson provided Domino Sugar's Sproull with other conspirators' highly confidential, commercially sensitive pricing information that Henderson obtained while attending an annual trade event known as the International Sweetener Colloquium ("ISC").

83. In his email message – titled "Colloquium Recap" – Henderson provided a "summary of points from the International Sweetener Colloquium that took place last week in Palm Springs," including "Competitive Numbers (FY 2021 and notes)" that detailed the current and future selling positions of other conspirators.

84. Specifically, Henderson learned and conveyed, among other information, that Michigan Sugar was "firm at $38.50 for 2021" and that Defendant United had recently "took prices up to $36.50."

85. Soon thereafter, Sproull forwarded Henderson's email to Luis Fernandez, a president at Domino Sugar, noting that the competitor pricing information was "nothing we haven't talked about already I don't think – but a bit more details."

86. As this exchange illustrates, the Producer Defendants exchanged Confidential Competitive Information (including current and future pricing information) and such information was welcomed by and conveyed to the highest levels of company management.

87. Sproull's casual reaction ("nothing we haven't talked about already") illustrates the frequency of such conduct. It wasn't an unusual occurrence; it was the norm.

88. On August 17, 2020, Commodity was "getting rolling on pricing updates" and wanted to confirm its understanding with Domino Sugar's Henderson. Commodity was not shy about letting Domino Sugar know that it was obtaining pricing information directly from Domino's competitors, sharing that that it hoped to "hear from [Michigan Sugar] today."

89. Commodity asked Domino Sugar where they "would put beet prices and coverage" and where they would "put cane prices and coverage." In effect, Commodity promised Domino Sugar non-public, commercially sensitive information about its competitors, and, in return, wanted Domino to share its non-public, commercially sensitive information.

90. Domino Sugar's Henderson obliged, responding to Commodity next day with a "Quick update" on pricing and coverage, stating he "agree[d] with [Commodity's] assessment" that "beets [were] looking for support at higher prices (up $1.00 cwt?) now that they [were] 70 to 75% priced in." He further stated that in the South, prices were "$37.50 to $37.75 Bulk FOB – fighting Cargill mainly" but that in the West, prices were "$39.50 to $40.00 Bulk FOB – values staying strong" and "Cane gulf still fighting for share – but some talk of Cargill moving prices up to $37.50 gross fob."

91. Roughly a month later, on September 21, 2020, Commodity was at it again, revealing to Domino Sugar's Henderson the pricing and booking positions of co-conspirators Michigan Sugar and United. Specifically, Commodity advised that Michigan's price was at $38.50 with 90% sold and United's last price was in the range of $36.50 - $38 with 90% sold. As a result of the Producing Defendants' sold position, "prices [were] firm to higher," with Michigan $38.5+, selecting selling 90+%; Western $36.75, mostly out of the market, 90+%, United also 90+%

(including cane) not sure on price, last indication was early Sep, were still in market and mostly firm at $36.50 and $38."

92. On the very same day of the foregoing exchange with Domino Sugar, Commodity confirmed United's pricing and sold positions with United's Director of Strategic Accounts, Eric Speece. Commodity asked Speece "I hear you folks are also 90+%, and I'd guess still mostly firm at $36.50 and $38, correct?" Speece responded that "[w]e are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold."

93. Commodity also shared Domino's prices and sold positions with United, advising United that Domino Sugar was approximately 70% sold with prices "back up to $40.50 to $41."

94. Commodity then emailed Domino Sugar's Henderson the next day, September 22, 2020, to pass along, among other information, United's pricing information and sold positions to Domino Sugar's Henderson, saying: "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month. Still trying to get to the bottom of cane coverage, need to hear back from one or two others. U.S. Sugar well sold, but for FY21. Cargill, confirmed by number of sources, is well sold, but unclear if whether FY21 or 2021, probably 2021. And imperial reported about two weeks ago that they were only 65% for 2021.... Beet not much change from earlier indications, prices are $46.50 to $38.75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked."

95. As this exchange shows, Commodity would routinely ask the Producing Defendants for current and future pricing information, the Producing Defendants would each separately provide it, and Commodity would thereafter complete the exchange by sharing the information between them.

96. As United's Eric Speece confirmed at the DOJ Merger Action, spot position is important information to know, as it affects pricing to customers, and that he would not call competitors to get pricing or spot information directly from them that he was getting from Wistisen.

97. Speece of United, Henderson of Domino Sugar, and Wistisen of Commodity continued exchanging information in November 2020.

98. On November 16, 2020, Dick Swart told Speece that he would like Commodity "to hear $36.50/$38.00 and probably moving higher based on the strength of the booked position." Speece told Wistisen, "We remain at $36.50 and $38.50 but will probably going higher given our strong sold position."

99. Wistisen then emailed Henderson the next day, November 17, 2020, reporting "Good (prices)" and told Henderson, "So strange, I can't wrap my head around United's approach. They came up very short on production and market has firmed, but they're still at $36.50RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position (you don't say??)[.]"

100. The information exchanges in furtherance of the conspiracy continued in 2021.

101. For example, on January 20, 2021, United's Speece suggested to United's Executive Vice President, Dick Swart, and United's Director of Marketing, Steven Hanson, that United "may want to communicate pricing earlier than the colloquium to send a msg [message]" after Wistisen shared that at least one beet supplier was lowering pricing in FY22. Speece promised to call Wistisen the next day, stating "as it is always easier than black and white. Let me know if there are any key messages you would like me to relay on."

102. The "colloquium" was a reference to the aforementioned annual trade event known as the International Sweetener Colloquium, which United used as a forum to exchange pricing with other Refined Sugar producers so a further the effort to raise prices.

103. On February 15, 2021, United's Speece told Commodity that "[w]e are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries."

104. On February 17, 2021, two days after United's Speece told Wistisen that United was "still at the $36.50 and $38.50," Wistisen emailed Domino Sugar's Henderson to tell him that he had a "[l]ong conversation with United" and that United's "plan remains to hold steady at 36.50 and $38.50."

105. Domino Sugar quickly seized on the information, forwarding it to their Director of National Accounts with an internal message that said: "United is usually pretty upfront with Rich [Wistisen of Commodity]."

106. A couple of months later, on April 29, 2021, Commodity asked Domino Sugar's Henderson, "[w]here would you put price ranges and demand?" Along with the question, Commodity reported co-conspirator pricing, including "$39.00 firm Michigan."

107. Henderson responded the same day with Domino Sugar's own pricing structure: "[p]rices in FY21 are very firm with both coasts at $43.40/$44.00 bulk FOB basis." He went on to provide Domino's future pricing intentions for the next fiscal year stating, "[f]or us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

108. True to form, Commodity, in exchange for the information Domino Sugar provided, disclosed pricing updates to Domino Sugar for other Refined Sugar producers and marketers, along

with a message expressing hope that all would adhere to "discipline" to keep prices "looking good."

109. Similar exchanges in furtherance of the conspiracy occurred the next month.

110. On May 11, 2021, Commodity asked Domino Sugar's Henderson if "those higher spot prices, $43.50-44.00 [were] holding up?" Henderson quickly confirmed, responding the very next day that "prices are selling at $44.00 fob bulk basis."

111. Just six days later, on May 17, 2021, Commodity reached out to Henderson again, this time regarding sold positions, asking "[w]here would you put refiner FY22 coverage?" Commodity's Wistisen ended the email with continued assurances that he would "pass along what I hear on pricing and coverage."

112. With assurances that Wistisen would continue to serve as an intermediary of competitor information, Domino Sugar's Henderson quickly responded to Wistisen with both Domino's pricing and sold position information, stating: "FY21 prices – now at $45.00 fob bulk basis east and west coast [and] Florida and gulf $44.00 fob bulk basis. FY22 prices - $42.00 fob bulk basis, $40.50 fob bulk basis Florida and the gulf. FY22 coverage – approximately 35 to 40%."

113. In return for the valuable Confidential Competitive Information that Domino Sugar provided, on May 18, 2021, Commodity shared with Domino Sugar's Henderson that Commodity had "just talked with United" and reported that United's sold position was 40% and that its spot and forward prices were unchanged. In addition, Commodity reported that "Western limping along, NSM picking off business. They need to link up with another producer ... and fine tune those factories. They're still $46 spot and forward, 45-50% booked."

114. Soon thereafter, Henderson forwarded the information in Commodity's May 18, 2021 email to other executives at Domino Sugar.

115. A few weeks later, Commodity facilitated additional Defendant communications in furtherance of the conspiracy.

116. On June 17, 2021, Commodity provided competitor pricing information to Domino Sugar's Henderson. Regarding United, Commodity confirmed that "United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season." Further, he wrote: "Western supposedly (I'll talk with them tomorrow) increased prices to $36.50 net, not getting many takers.... No talk on Michigan, yet. I hope to talk with them Fri/Mon.... Cane: I'm hearing Cargill is really chasing prices lower, a few deals under $37 gross.... And that Southeast has slipped below $38?... But that ASR is holding firm on the coasts.... As soon as I get an update from Crystal, I'll send it over[.]"

117. In return, a day later, on June 18, 2021, Henderson confirmed to Commodity Domino Sugar's future pricing plans for October 2021 to December 2021 and January 2022 to December 2022 and that "[c]ane prices [were] firming up as #16 values rise." Henderson asked "Word on the street is United moving up a $1.00 cwt since bookings now over 60%."

118. On June 21, 2021, Commodity again emailed Domino Sugar's Henderson with competitor information. The subject of the email was "United: prices unchanged at $36.50 RRV and $38.50 Florida, coverage rising rapidly but currently only +/-55%." Commodity further requested information that Domino Sugar reciprocate the information exchanged, asking in the same email's subject line, "Where is ASR on pricing in Southeast?" Domino Sugar's Henderson, knowing the information would be shared with competitors, promptly responded with Domino Sugar's pricing in the southeast: "$39.50 fob bulk for ASR Southeast."

119. Commodity and Producer Defendants continued to exchange Confidential Competitive Information in furtherance of the conspiracy in July 2021.

120. Weeks after their June exchange, Commodity told Domino Sugar's Henderson that Commodity was "[h]earing some big coverage numbers on the beet side." Among other information, Commodity shared that "Michigan and Western 80+%, and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon). Hearing NSM still a bit aggressive, at least into Texas." Commodity also inquired about Domino Sugar's pricing: "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

121. Domino Sugar's Henderson quickly complied with Commodity's request, informing Commodity that "[n]ear-by's trading as high as $36.60! Our pricing for remainder of FY21 is $48.00 bulk basis all locations. With raws remaining high in the Oct. Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf." Henderson further disclosed Domino Sugar's coverage and future pricing for 2022 contracts: "For Y22 close to 65% booked and moving prices up."

122. Three days later, on July 16, 2021, Commodity informed Domino Sugar's Henderson that "I don't understand, but this is the word from United: 80-85% sold, will be over 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm.... Hearing both Western and Michigan temporarily out of the market." Commodity then asked Henderson, "Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts."

123. Henderson, as usual, promptly disclosed Domino Sugar's pricing as well as United's, stating, "Yes, I hear United Clewiston raised their price………some noted up to $40.50 fob.... We are no[w] $40.50 gulf, $43.00 fob east and west coast."

124. These examples of Defendants' communications merely scratch the surface. Defendants' conspiratorial conduct, including the routine exchanges of Confidential Competitive Information of the nature shown above, continued long after July of 2021.

### B. Producer Defendants Agreed to a Common Pricing Formula to Further Their Effort to Fix Prices

125. In furtherance of their conspiracy, the Producer Defendants developed and agreed to standardized pricing formulas.

126. In particular, the Producer Defendants referenced or relied on publicly observed index pricing, such as futures prices referenced in the Intercontinental Exchange No. 16 index, which measures domestic U.S. price for physical delivery of raw cane sugar, to set their FOB pricing for Refined Sugar.

127. Communications during the Relevant Time Period highlight how shared reliance on such benchmarks strengthened the effectiveness of Defendants' collusion. For example, in February of 2021, Commodity's Wistisen told Domino Sugar's Henderson that on the pricing side, sugar prices could increase thanks, inter alia, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices."

128. Similarly, in July 2021, Domino Sugar's Henderson referenced United's then impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." Henderson later suggested that Domino Sugar was "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match Domino Sugar's price of $40.50. This increase followed a "big huddle" among United's marketing team, a clear signal of the considered and deliberate nature of the decision.

129. Imperial, even though it operated outside the domestic production framework before its acquisition by United, also relied on pricing formulas tied to Number 16 prices. Notably,

Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

130. Absent the conspiracy, Producing Defendants would have no reason to share their pricing formula strategies as they concern the No. 16 index with Wistisen, who they knew would transmit such information directly to their competitors.

131. By jointly using common pricing formulas based on or informed by Number 16 index, the Producer Defendants created an environment where their price-fixing flourished, all to the detriment of purchasers such as Plaintiffs.

### C. <u>Defendants Utilized their Exchanges of Confidential Competitive Information to Raise Prices in Parallel During the Relevant Time Period</u>

132. The Producing Defendants relied on and used the Competitive Confidential Information that they obtained directly and indirectly, including through Commodity to increase prices in parallel during the Relevant Time Period.

133. For example, after Domino Sugar learned Cargill's and United's pricing in May 2021, including that in "talking with ... Rich Wistisen" who believed that Cargill was "offering $2.00 above RRV beets for FY22, Domino Sugar's Henderson forwarded that pricing information to Domino Sugar's Sproull, who shared the information again with his superior noting Domino Sugar had "an idea what we'd have to buy share through" and what they would "have to be around."

134. In another example referenced above, in January 2021, United's Speece expressed concern to his colleagues at United after learning of Defendant NSM's pricing, and told them that United "may want to communicate pricing earlier than the colloquium to send a msg [message]."

To ensure the message got out to United's co-conspirators, Speece told his colleagues, including Dirk Swart, an Executive Vice President of Industry Sales & Marketing, and Steven Hanson, Director of Marketing, that he would call Wistisen tomorrow.

135. Domino Sugar's Henderson frequently forwarded Confidential Competitively Information from Wistisen to his sales team and superiors. For example, in May 2021, when Henderson received information from Wistisen that competitor United would likely be adding bookings and raising prices "not by just a dollar," Henderson forwarded that information internally.

136. And when Domino Sugar's Henderson learned, in August 2020, of Imperial's sold position, he quickly noted the value of such Confidential Competitive Information, telling his Domio Sugar colleague that "Imperial being sold out gives us justification for a premium in Oct/Dec. vs. Cy 2021 business."

137. In November 2020, United's Executive Vice President Dirk Swart told United's Speece that he wanted Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38 and that United was considering increases given its sold position. They mulled over about what they wanted to "indicate" to Wistisen, illustrating how they viewed him as their conduit to their co-conspirators. Thereafter, they decided to move the conversation off email and onto a phone call – a further signal they recognized their wrongdoing.

138. As these examples demonstrate, Producing Defendants' exchanges of sold positions, prices and other Competitive Confidential Information was not simply a useful data point, it was the basis upon which they could effectively raise prices together, and extract a premium at the expense of purchasers like Plaintiffs.

139. And raise prices they did.

140. Producer Defendants were not hypothesizing that they could use their competitors' Confidential Competitive Information to raise prices. Various data points confirm that Refined Sugar prices increased dramatically during the Relevant Time Period.

141. According to USDA tables, the average spot price of refined beet sugar in Midwest markets increased from $0.3614 per pound for calendar year 2019 to $0.5168 per pound for calendar year 2024. Similarly, the average price of refined cane sugar in Northeast markets increased from $0.3800 per pound for calendar year 2019 to $0.6012 per pound for calendar year 2024. Similarly, the price of Number 16 futures contracts for U.S. raw cane sugar also experienced an upward trend from an average price of $0.2612 per pound in 2019 to $0.3822 in 2024. And between 2019 and 2024, the Produce Price Index ("PPI") for refined sugar products and byproducts, an economic metric calculated by the U.S. Bureau of Labor Statistics that tracks the price changes for goods and services, increased from 171.600 in January 2019 to 261.647 in December 2024.

142. Moreover, many of the price increases occurred soon after opportunities to conspire, including following the annual International Sweetener Colloquium meetings.

143. Between February 24 and February 27, 2019, industry participants attended the International Sweetener Colloquium meeting in Florida. After the ISC meeting, in April 2019, beet processors held offers firm for 2019-20 season at around $0.35 per pound f.o.b. in the Midwest.

144. The price of refined cane sugar also jumped in the Northeast from $0.37 per pound f.o.b. in February 2019 to $0.42 per pound f.o.b. in November 2019. By November 2019, ASR/Domino was offering its cane sugar on the spot market at $0.44 per pound f.o.b. and United's Dirk Swart was telling Eric Speece that United wanted Mr. Wistisen "to hear $36.50/38.00" on

beet sugar prices. Mr. Wistisen heard United's message loud and clear, so that by December 2019, beet sugar contracts pricing for the 2020-21 season continued to rise at between $0.36 and $0.38 per pound f.o.b. from the Midwest. These price increases had a cumulative effect, by February 2020, bulk Refined Sugar prices were reportedly at seven-year highs.

145. In 2020, the ISC meeting was again held in late February. Days after the end of the ISC meeting, on March 3, 2020, Domino Sugar's Mr. Hendersen sent an internal email to his colleague Mr. Sproull regarding "Colloquium Recap," providing, among other things, "a summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including that "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM - still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial - 38.00/38.50 for CY 2021 on bulk EFG."

146. Following the February ISC meeting, in March and April 2020, beet processors offered beet sugar between $0.36 per pound f.o.b. to $0.38 per pound f.o.b. in the Midwest for the 2020-21 season. Indeed, Michigan Sugar offered its beet sugar for $0.38 per pound f.o.b. for 2021 while ASR/Domino offered refined cane sugar for $0.41 per pound f.o.b. Prices for spot bulk refined sugar also increased from $0.44 per pound f.o.b. to $0.46 per pound f.o.b. in March 2020.

147. On September 21, 2020, United conveyed to Mr. Wistisen that it was "firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt)." The next day, Mr. Wistisen confirmed that the "cane range [was now] $38.50 [cwt] to $41 [cwt]…." Spot beet sugar prices from late September 2020 to December 2020 remained firm at $0.36.

148. On February 17, 2021, Mr. Wistisen conveyed the following to Mr. Henderson at Domino Sugar: "Long conversation with United: won't set FY 22 price list until March, but the plan remains to hold steady at $36.50 and $38.50...." Indeed, following the ISC meeting on March 3, 2021, most producers continued to offer beet sugar for $0.36 f.o.b. and $0.38.

149. In addition to holding prices firm in parallel, Defendants increased their prices in parallel. By May 2021, United's stance had changed from holding firm on prices, and Mr. Wistisen, after "[j]ust talk[ing] with United" told Domino Sugar to "expect big action over the next month, ... and at that time expect to raise prices, and not by just a dollar...."

150. For the 2021-22 contract season, Michigan Sugar started its offers at $0.38 per pound f.o.b. increasing to $0.39 in June 2021. Also in June 2021, Domino Sugar offered its refined cane sugar for $0.42 per pound f.o.b. from its Northeast and West Coast refineries. By July 12, 2021, Domino Sugar was telling Commodity that "Our pricing for remainder of FY21 is $48.00 [cwt] bulk basis all locations" and that "in the Oct./Dec. 21 period are $46.00 [cwt] fob bulk basis east/west and $44.00 gulf."

151. Following the ISC meeting in early March 2022, the average price of refined beet sugar spiked from $0.42 per pound f.o.b. in the Midwest in March 2022 to $0.70 in July 2022 – almost a 40% increase. The average price of spot refined cane sugar in the Northeast increased from $0.52 per pound f.o.b. in March 2022 to $0.53 in April 2022 and continuously increased to $0.68 in July 2022.

152. The DOJ in the Merger Action concluded that, like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline." For example, Domino Sugar internally discussed a decision not to get "aggressive" on pricing, fearing that its action would "send[] a

signal out to competitors that we are chasing business and lowering pricing." Domino Sugar's Robert Sproull instructed Mr. Henderson to "signal to the market" that there would be tightness and Domino Sugar would maintain price.

153. As further evidence of parallel conduct and pricing, Domino Sugar bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry...." Further, "[a]fter speaking with his 'trusted friend,' the Imperial CEO, Domino Sugar's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [ASR/Domino]."

154. Defendants' pricing resulted in dramatic overall increases to the market for Refined Sugar. PPI of Refined Sugar Products and Byproducts rose during the Relevant Time Period from 171.600 to 261.647, an approximately 66% overall increase.

**D. <u>Numerous Plus Factors Support the Existence of a Conspiracy</u>**

155. In addition to the extensive information sharing and other indicators of conspiratorial conduct outlined above, others plus factors indicate collusion was at play. These plus factors include: 1) frequent opportunities to conspire; 2) actions against unilateral self-interest; 3) high barriers to market entry; 4) concentrated market shares and vertical integration across the industry, 5) a lack of substitutes contributing to inelastic demand; and 6) a long history of antitrust violations in the industry.

(i) <u>Opportunities to Conspire</u>

156. There were multiple opportunities for Defendants to develop, monitor and execute their scheme.

157. One example is the International Sweetener Colloquium, the aforementioned annual event hosted by The Sweetener Users Association ("SUA") and the International Dairy Farmers Association ("IDFA").

158. The ISC provided ample opportunities for private conversations among Producing Defendants through features such as a hotel stay, golf tournament, presentations, receptions, breakfasts, luncheons, parties, and other social events.

159. As with their use of Commodity, Producing Defendants utilized these opportunities to further their conspiracy. For example, the 2020 ISC is where Domino Sugar's Henderson gathered the Producing Defendants' competitive information later reported to other Domino Sugar employees in March 2020. Similarly, United has acknowledged that Refined Sugar producers use the ISC to communicate pricing, internally debating whether United should have communicated pricing earlier than the ISC.

160. Representatives of all the Producing Defendants have attended at least one ISC during the Relevant Time Period, and Defendants United and Domino Sugar routinely sponsor the event.

161. The American Sugar Alliance also hosts an annual symposium (the "Symposium") attended by Producing Defendants and others in the sugar industry. The Symposium was in its 39th year as of 2024 and attendance "is a must-attend event for all stakeholders." As with the ISC, the Symposium typically features numerous social and other functions amenable to private conversations between Defendants such as a hotel stay, a golf tournament, a reception gala, information sessions and meetings, and breakfast, luncheon, and dinner.

162. At the ISC, the Symposium, and/or other trade events, the Producing Defendants had ample opportunity, which they utilized, to execute, implement and further their conspiracy through the exchange of confidential, competitive information.

(ii) Actions against Unilateral Self-Interest

163. The Producing Defendants' conduct, absent a conspiracy, would have been at odds with their individual self-interest.

164. Had they not been conspiring, Producing Defendants would never have disclosed their confidential pricing, pricing strategies, and sold positions because such disclosures would allow competitors to take customers and increase their own profits at the expense of the disclosing party. True competitors do not hand competitive advantages to their competition.

165. Indeed, the Producing Defendants had codes of conduct, rules, and policies that prohibited the sharing of the very types of highly confidential, competitive information that they directly and indirectly disclosed to their competitors in furtherance of the conspiracy.

166. Yet, Defendants did it anyway because, while it may not have benefitted their individual interests in a competitive marketplace, it benefited the collective interests of their price fixing conspiracy.

(iii) High Barriers to Entry and Highly Concentrated Market with Vertically-Integrated Producers

167. The barriers to becoming a producer of Refined Sugar are significant. Refined Sugar manufacturers have large economies of scale that utilize massive and expensive production facilities. The startup capital necessary to enter the market and compete with existing Refined Sugar manufacturers is substantial.

168. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive

pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry such as those that exist in the Refined Sugar industry facilitate the formation and maintenance of a conspiracy.

169. The existence of high barriers to entry is evidenced by the increasing consolidation in the industry. Today there are half as many sugar manufacturers as there were 40 years ago. The Producing Defendants and their co-conspirators control at least approximately 70% of this highly concentrated market, giving them the ability and incentive to collusively manipulate pricing. In addition to being concentrated among a few large manufacturers, namely, the Producing Defendants, the Refined Sugar industry is almost entirely vertically integrated. That is, a Refined Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar or Refined Sugar to direct purchasers. Producing Defendants' vertical integration further insulated them from competition and further incentivized the formation and maintenance of their conspiracy.

(iv) The Market for Refined Sugar is Characterized by Inelastic Demand

170. Refined Sugar has no meaningful substitutes, making demand for the product inelastic. As a result, increases in the price of Refined Sugar do not materially impact the quantity demanded and sold in the marketplace. This demand characteristic encourages collusion because cartel members can, as Producing Defendants did here, raise prices without experiencing a meaningful decline in sales revenue.

171. In sum, the foregoing characteristics of the Refined Sugar industry made Defendants' exchanges of Confidential Competitive Information highly anticompetitive and allowed the Producing Defendants to raise, fix, maintain, or stabilize Refined Sugar prices during the Relevant Time Period.

(v) The Sugar Industry Has a History of Government Investigations and Collusive Actions

172. This is not the first time the Sugar industry has engaged in collusive conduct.

173. In the 1930s, the U.S. Supreme Court upheld a lower court ruling that the Sugar Institute, an industry trade association, violated the antitrust laws by, among other things, requiring advance pricing announcements by manufacturers with "a requirement of adherence, without deviation, to the prices and terms publicly announced." *See, e.g.*, *United States v. Sugar Institute*, 297 U.S. 553 (1936).

174. In the 1970s, the Department of Justice accused sugar refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing. Defendants in that case entered into a consent decree with the Department of Justice in 1978 that enjoined them from, among other things, "agreeing to fix prices or announce price changes in advance for the sale of ... sugar ... and from exchanging information, directly or indirectly, as to the sale of ... sugar." *United States v. Great Western Sugar Co.*, et al., No. 74- 2674-SW, 1978 WL 1388, at *2 (N.D. Cal. Sept. 13, 1978).

175. These cases show that the sugar industry has fostered anticompetitive behavior, and that history is repeating itself with Defendants' latest effort to inflate sugar prices and their profits at the expense of purchasers like Plaintiffs.

**E. All of Plaintiffs' Claims are Timely**

176. Defendants affirmatively and fraudulently concealed their conspiracy from Plaintiffs, and Defendants' unlawful conduct was self-concealing.

177. Plaintiffs were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the Merger Action trial exhibits were made public on or around November 1, 2022, which is less than four years before this filing.

178. Before November 1, 2022, Plaintiffs had insufficient information to determine that Defendants were involved in a conspiracy to fix prices of Refined Sugar.

179. In addition, Plaintiffs' claims have been tolled and are otherwise timely for other reasons.

180. First, Plaintiffs' claims are tolled by the first Direct Purchaser Class Action Complaint filed on March 14, 2024.

181. Each Plaintiff is a member of the Direct Purchaser Class, and under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, the pendency of that direct purchaser class action, tolls the statute of limitations for Plaintiffs' claims.

182. The filing of the first putative direct purchaser complaint on March 14, 2024 tolled the statute of limitations as to the entirety of Plaintiffs' Sherman Act claims alleged herein. In the alternative, Plaintiffs' claims for Granulated Sugar and powdered sugar were tolled as of March 14, 2024, and Plaintiffs' claims concerning all Refined Sugar products in addition to Granulated Sugar – including liquid, powdered, and brown sugar – were tolled for a period running from December 9, 2024, when the putative direct purchaser plaintiffs filed a Consolidated Class Action Complaint alleging a price-fixing conspiracy encompassing Refined Sugar (*id.*, Dkt . No. 294), through February 27, 2025, when the putative direct purchaser class filed a superseding Master Consolidated Complaint limiting their claims to Granulated Sugar alone. *Id.*, Dkt. No. 332.

183. Second, Plaintiffs' claims are timely due to the continuing violations doctrine.

184. Each sale of Refined Sugar by Defendants at prices impacted by the conspiracy constitutes a new overt act causing injury to Plaintiffs. Such sales to Plaintiffs here occurred well within the limitation period.

185. Third, Defendants' conspiracy was inherently self-concealing, and, throughout the Relevant Time Period, Defendants actively, effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs.

186. Defendants promised to obey the law and act with integrity.

187. For example, Domino Sugar had a written code of conduct with an ethics policy that prevented any Domino Sugar employee from directly talking about Domino Sugar's pricing with a representative of one of Domino Sugar's competitors. ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations." It further states that it seeks success "only ... while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is "prohibited" from engaging in "agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding ... [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] ... [and] [b]usiness, marketing or strategic plans."

188. United's Code of Business Conduct and Ethics is similar, stating that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It continues: "[w]e seek to outperform

our competition fairly and honestly," and that there is an "obligation to protect [United's] assets [including United's] confidential information.... Unauthorized use or distribution of United Sugars' confidential information is prohibited."

189. Plaintiffs act diligently to identify wrongdoing by their suppliers, including their Refined Sugar suppliers.

190. However, these types of public promises by Defendants to obey the law and behave with integrity were false and misleading and contributed to purchasers, such as Plaintiffs, being unable to discover Defendants' conduct earlier than November 1, 2022.

191. As such, Defendants' fraudulent concealment of their unlawful conspiracy has tolled any applicable statutes of limitations for Plaintiffs regarding any claims and rights of action alleged by Plaintiffs in this Complaint.

### F. Defendants' Conspiracy Existed Independently of the USDA's Regulatory Framework

192. The USDA Sugar Program is federal program, established under the Agriculture and Food Act of 1981, designed to regulate sugar levels in the United States.

193. While the USDA Sugar Program sets certain parameters within the domestic sugar market, it does not set maximum prices for sugar or shield Refined Sugar producers from domestic competition.

194. The USDA Sugar Program has three major pillars: support loans, marketing allotments, and import quotas, none of which preclude the existence – or impact – of price-fixing conspiracies like the one Defendants engaged in here.

195. Price support loans allow sugar processors to borrow against their inventory at predetermined rates and, if necessary due to low prices, forfeit their sugar as loan repayment. But

during the Relevant Time Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's support levels.

196. Marketing allotments limit the overall amount of sugar that sugar producers can sell domestically for human consumption. However, the Sugar Program does not require producers to satisfy their allotments – individually or in the aggregate. Moreover, the allotment framework limited the ability of any non-conspirator producers to undermine the scheme through alternative, non-price fixed sales.

197. Import quotas and tariffs are designed to protect domestic producers by limiting the amount of foreign sugar entering the market. These restrictions were consistent with the conspiracy because they limited external competitive pressures to counteract the Producer Defendants' collusive pricing strategies.

198. The USDA Sugar Program does not actively regulate, or cap, market prices for Refined Sugar.

199. To the contrary, it provided a framework that Defendants exploited to execute their conspiracy.

## VII. <u>ANTITRUST IMPACT AND DAMAGES TO PLAINTIFFS</u>

200. Because of Defendants' anticompetitive conduct: (1) competition in the Refined Sugar market has been reduced or eliminated, (2) prices for Refined Sugar have been maintained at supracompetitive levels, and (3) Plaintiffs have been deprived of the benefit of price competition.

201. As described herein, during the Relevant Time Period, Plaintiffs directly purchased Refined Sugar from one or more Producing Defendants.

202. As a result of Defendants' anticompetitive conduct, Plaintiffs paid more for Refined Sugar than they otherwise would have and thus suffered antitrust injury and damages. The excesses paid by Plaintiffs for Refined Sugar constitutes antitrust injury and harm to competition under the federal antitrust laws.

## VIII. CLAIMS FOR RELIEF AND CAUSES OF ACTION

### COUNT I

### PRICE FIXING CAUSE OF ACTION FOR VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)

203. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

204. Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act, (15 U.S.C. §§ 1, 3) to raise, fix, maintain, or stabilize Refined Sugar prices.

205. Beginning at a time uncertain, but at least by 2019, Defendants agreed with each other to exchange Competitive Confidential Information, including competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Refined Sugar. The agreement was intended to and did unreasonably restrain trade, suppress competition, and had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States in violation of Section 1and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

206. Pursuant to the agreement, Defendants agreed to and did share pricing, sold position, and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Refined Sugar sold to Plaintiffs.

207. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

208. Plaintiffs were injured by Defendants' agreement that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of Refined Sugar at artificially high levels. Plaintiffs paid higher prices for Refined Sugar than they would have in the absence of Defendants' violations of Section 1 of the Sherman Act.

209. As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property.

210. Plaintiffs are entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act (15 U.S.C. § 15).

## COUNT II

## UNLAWFUL INFORMATION EXCHANGE CAUSE OF ACTION FOR VIOLATION OF SECTION 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)

211. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

212. Because this claim is based upon the Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Refined Sugar.

213. During the Relevant Time Period, the Producer Defendants and their conspirators controlled at least a collective 70% of the Refined Sugar market and thus possessed market power within it.

214. Beginning at least as early as 2019, Producing Defendants agreed with each other to exchange Competitive Confidential Information, including competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States.

215. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States to or at supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

216. Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Refined Sugar sold in the United States to Plaintiffs to or at supra-competitive levels.

217. This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

218. The contract, combination, or conspiracy alleged herein has had the following effects, among others: a) Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States; b) Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and c) Plaintiffs have been deprived of the benefits of free and open competition.

219. For all these reasons, Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

220. As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property. Plaintiffs are entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Section 4 of the Clayton Act (15 U.S.C. § 15).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

1. That the Court adjudge and decree that Defendants' anticompetitive scheme unreasonably restrained trade and is unlawful and that each has violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

2. That the Court award Plaintiffs three times their damages sustained from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15(a));

3. That the Court award Plaintiffs their costs of this case and reasonable attorneys' fees under Section 4 of the Clayton Act (15 U.S.C. § 15(a));

4. That the Court award Plaintiffs pre- and post-judgment interest to the extent allowed by law, including 15 U.S.C. § 15(a) and 28 U.S.C. § 1961; and

5. That the Court award Plaintiffs such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on any and all claims from which a right to a jury arises.

Dated: August 3, 2026

Respectfully submitted,

By: ______________________________

William J. Blechman, Esquire
Douglas H. Patton, Esquire
Michael A. Ponzoli, Esquire
SPERLING KENNY NACHWALTER, LLC
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: wjb@sperlingkenny.com
dpatton@sperlingkenny.com
mponzoli@sperlingkenny.com

Ryan Holt, Esquire
SHERRARD ROE VOIGT & HARBISON
1600 West End Avenue
Suite 1750
Nashville, TN 37203
Tel: (615) 742-4200
E-mail: RHolt@srvhlaw.com

Joseph Vanek, Esquire
David P. Germaine, Esquire
John P. Bjork, Esquire
Alberto Rodriguez, Esquire
Paul Bateman, Jr., Esquire
SPERLING KENNY NACHWALTER, LLC
321 North Clark Street
25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
E-mail: jvanek@sperlingkenny.com
dgermaine@sperlingkenny.com
jbjork@sperlingkenny.com
arodriguez@sperlingkenny.com
pbateman@sperlingkenny.com

***Counsel for Plaintiffs***

8016678.1